**BRIEF IN SUPPORT**

I.    **FACTS AND BACKGROUND**

Shortly before 11 p.m. on June 13, 2011, Plaintiff's brother, Howard Hammon, III, rear-ended a car at the intersection of Pearl Rd. and Fowles Rd., in Middleburg Heights, Ohio. Patrolman ("Ptl.") David Holderbaum responded to the scene after a number of individuals called 9-1-1 to report the accident. (Deposition of David Holderbaum ("Holderbaum depo."), at 75; 78). Shortly after Ptl. Holderbaum arrived on the scene, he spoke with Mr. Hammon, who appeared disoriented. (Id. at 83-84). When he attempted to perform a sobriety test, Mr. Hammon simply stared at him and would not follow his instructions. (Id. at 85). Ptl. Holderbaum escorted Mr. Hammon to the rear of his cruiser, where Mr. Hammon disclosed that he had a marijuana "bowl" in his possession. (Id. at 86). Ptl. Holderbaum then removed that object and Mr. Hammon's other personal property from his pockets, and placed them on the back of his cruiser. Ptl. Holderbaum then asked Mr. Hammon to step to the front of the vehicle, so that he could perform another sobriety test. Mr. Hammon refused to comply, and instead tried to reach toward the back of the vehicle, where his personal property was located, stating that he wanted a cigarette. (Id. at 88). Ptl. Holderbaum told him that he could not have a cigarette, and again ordered him to move to the front of the vehicle. Mr. Hammon again refused to comply, and instead tried to reach toward the back of the cruiser again. (Id.).

Ptl. Holderbaum then attempted to place Mr. Hammon in handcuffs. Sgt. Eric Burgett came to assist, and held Mr. Hammon's left wrist, while Ptl. Holderbaum placed a handcuff on his right wrist.  Because of Mr. Hammon's large size, Ptl. Holderbaum was in the process of getting an extra pair of cuffs for his left hand, when Hammon pulled away and resisted. (Id. at

1

88-89). Both officers struggled with him while standing upright, but eventually had to take him to the ground to gain control, where he continued to resist, despite repeated orders to stop and give the officers his hands to be handcuffed. (Id. at 90). The officers warned him that if he did not stop resisting, he would be tased. (Id. at 91). When he continued to resist, Ptl. Holderbaum deployed his X-26 Taser unit in drive-stun mode,[1] and applied one cycle to Mr. Hammon. The Taser did not persuade Mr. Hammon to comply, and they ended up in a face-to-face position on the ground, which is very dangerous for the officers. (Id. at 92).

The officers decided to de-escalate the situation by retreating a few steps back and giving Mr. Hammon verbal commands to lay on his stomach and put his hands behind his back. (Id. at 116-117; 120). Instead, Mr. Hammon rolled over and sat up, facing the officers. The officers again warned Mr. Hammon to comply with their orders or he would be tased. Instead of complying, he swung his arm and went to his feet. (Id. at 120-121). Ptl. Holderbaum then deployed his Taser probes into Mr. Hammon's chest from approximately 6 feet away. However, the Taser appeared to have no effect upon Mr. Hammon, who looked like he was going to approach the officers. (Id. at 122-123). Sgt. Burgett then deployed his Taser's probes, and initially Mr. Hammon seemed to react, by falling into the grassy area next to the road. (Id. at 123; Deposition of Sgt. Eric Burgett ("Burgett depo."), at 177). However, once he was on the ground, he continued to resist by placing his hands underneath his body and refusing to allow himself to be handcuffed. (Holderbaum depo. at 127; Burgett depo. at 181).

---

[1] The X-26 Taser devices used by the Middleburg Heights officers can be used in two ways.  In what is known as "drive stun" mode, the device is placed directly against the skin or clothing of the subject and is used for pain compliance.  The device can also be fitted with a disposable cartridge containing two probes, which are deployed by a propellant into the skin or clothing of the subject, to cause neuromuscular disruption.  Those probes are attached to the X-26 unit by wires which deliver the electrical current from the device to the subject. *See Goebel v. Taser Intern., Inc.* 2007 WL 2713053, FN2, 3 (N.D. Ohio 2007).

Ptl. Joe Duff, who had been speaking with the driver of the vehicle Mr. Hammon hit, came over to assist Ptl. Holderbaum and Sgt. Burgett. (Deposition of Ptl. Joe Duff ("Duff depo."), at 67). Ptl. Duff attempted to restrain Mr. Hammon's legs while Ptl. Holderbaum continued to struggle with Mr. Hammon and get him handcuffed. (Id. at 79). Ptl. Duff then used his own Taser in drive-stun mode on Mr. Hammon's lower back, in an attempt to gain control. (Id. at 54). The officers were then joined by Ptl. Nick McCoy, who had just ended his shift at the Middleburg Heights Police Department and was on his way home when he saw the other officers struggling with Mr. Hammon and stopped to help. (Deposition of Ptl. Nick McCoy ("McCoy depo."), at 20). Ptl. McCoy positioned himself on the ground near Mr. Hammon's head and restrained his head and shoulder. (Id. at 21). During the course of the struggle, both Ptl. Holderbaum and Ptl. McCoy were inadvertently shocked by the leads of Sgt. Burgett's Taser. (Holderbaum depo. at 139; McCoy depo. at 21)

The four officers, working together, were finally able to get Mr. Hammon handcuffed. Sgt. Burgett then immediately radioed dispatch and requested an ambulance for Mr. Hammon. (Burgett depo. at 193-194). Lt. Ray Bulka, who arrived just as the officers got Mr. Hammon handcuffed, and Sgt. Burgett took turns staying with Mr. Hammon, who remained handcuffed in the grass, with his face to the side, until the ambulance arrived. Both Ptl. McCoy and Sgt. Burgett observed Mr. Hammon to be resting quietly and breathing during that time. (McCoy depo. at 40-41; Burgett depo. at 193-194)  Just as the ambulance arrived, Sgt. Burgett observed that Mr. Hammon appeared not to be breathing. He notified the responding paramedics, who began evaluating and treating Mr. Hammon. Ptl. Holderbaum and Sgt. Burgett later learned that Mr. Hammon had been pronounced dead.

Plaintiff Neva Hammon, Mr. Hammon's sister and the administratrix of his estate, has now filed a Complaint against Defendants Holderbaum, Burgett, Duff, McCoy, Bulka (collectively, the "Defendant Officers"), and the City of Middleburg Heights ("the City"), alleging claims pursuant to 42 U.S.C. § 1983 of excessive force, deliberate indifference to a serious medical need, as well as state-law claims of assault, battery, and wrongful death against the Defendant Officers, as well as claims against the City and Chief John Maddox, in his official capacity, for the alleged adoption of unconstitutional customs and polices, failure to train, and ratification. The Defendant Officers, Chief Maddox, and the City now seek summary judgment in their favor on Plaintiff's claims for the reasons stated more fully below.

## II.   LAW AND ARGUMENT

### A.   DEFENDANTS HOLDERBAUM, BURGETT, MCCOY, DUFF, AND BULKA ARE ENTITLED TO JUDGMENT IN THEIR FAVOR AS A MATTER OF LAW BECAUSE THEY ARE ENTITLED TO QUALIFIED IMMUNITY FROM PLAINTIFF'S CLAIMS.

The doctrine of qualified immunity generally shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991). In determining whether a defendant is entitled to qualified immunity, the Court considers if: (1) while viewing the facts in the light most favorable to the plaintiff, a violation of a constitutional right occurred; and (2) the constitutional right at issue was clearly established at the time of the defendant's conduct. *Saucier v. Katz,* 533 U.S. 194, 201

4

(2001). The Court must also consider "whether the official's action was objectively unreasonable under the circumstances." *Harris v. Bornhorst, 513* F.3d 503, 511 (6th Cir.2008).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging that Mr. Hammon's constitutional rights were violated in the course of his arrest. In order to establish liability under § 1983, a plaintiff must show that those officials, acting under color of state law, caused the deprivation of a federal right. *See Kentucky v. Graham,* 473 U.S. 159, 166 (1985). If either element is missing, then a § 1983 claim cannot succeed. *Christy v. Randlett,* 932 F.2d 502, 504 (6th Cir.1991). Plaintiff has brought two claims under § 1983 against the Defendant Officers: 1) excessive force in violation of Mr. Hammon's Fourth Amendment rights and 2) deliberate indifference to a serious medical need, in violation of Mr. Hammon's Fourteenth Amendment rights.

    1.     *The Defendant Officers[2] are entitled to qualified immunity from Plaintiff's excessive force claims.*

First, Plaintiff claims that the officers' use of "several lengthy Taser gun applications, kicks, and strikes" in the course of the arrest of Mr. Hammon constituted excessive force. Second, Plaintiff claims that the officers' positioning of Mr. Hammon likewise constituted excessive force. An officer making an investigative stop or arrest has the right to use some degree of physical coercion to effect it. "Every push and shove an officer makes during the arrest," will not subject the officer to liability. *Collins v. Nagle,* 892 F.2d 489, 496 (6th Cir.1989). For an excessive force claim, the court must consider the particular facts of the case to determine whether the officers' use of force was objectively reasonable. *Marvin v. City of*

---

[2] Each of the individually-named officers has been sued by Plaintiff in both their individual and official capacities. An official-capacity claim against a public employee is equivalent to a claim against the entity by which he is employed, in this case, the City of Middleburg Heights. However, the defense of qualified immunity is available only for the individual-capacity claims.

5

*Taylor,* 509 F.3d 234, 245 (6th Cir.2007); *Floyd v. City of Detroit,* 518 F.3d 398, 405 (6th Cir.2008). The "objective reasonableness standard ... depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Dunn v. Matatall,* 549 F.3d 348, 353 (6th Cir.2008). This standard considers the information the officers actually possessed at the time, and recognizes that officers are forced to make "split-second judgments" regarding the need and amount of force used. *Anderson v. Creighton,* 483 U.S. 635, 641 (1987); *Graham v. Conner,* 490 U.S. 386, 396 (1989).

A court considering an officer's use of force must balance "the nature and quality of the intrusion on the [suspect's] Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. In other words, the Court should weigh Mr. Hammon's interest in not being tased, kicked, or struck, against the arresting officers' interests in effectuating the arrest, and in protecting Mr. Hammon, themselves, and the public. This balancing exercise is guided by an evaluation of the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Courts should also consider the number of people at risk from the suspect's conduct, the suspect's demeanor, the size and stature of the parties involved, and the suspect's degree of intoxication and noncompliance. *Davenport v. Causey,* 521 F.3d 544, 551 (6th Cir.2008).

Generally speaking, the Fourth Amendment right to be free from excessive force in the context of a seizure is clearly established. *Saucier,* 533 U.S. at 201-02. However, the Supreme Court has held that for the purposes of qualified immunity, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more

relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 202.  Therefore, this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. Ultimately, the definition of excessive force is, of course, the use of more force than necessary to subdue and/or detain a suspect. *Isibor v. City of Franklin*, 1998 WL 344078, *4 (6th Cir.1998). The undisputed facts in this case show that the officers involved in this incident used only the amount of force necessary to subdue Mr. Hammon and take him into custody, not more.

The use of a Taser device is non-lethal force, on the same level of the use-of-force continuum as pepper spray. *See*, *e.g*., *Burdine v. Kaiser*, 2012 WL 1379375 (N.D. Ohio 2012). One of the main purposes of nonlethal, temporarily incapacitating devices such as a Taser is to give police effective options short of lethal force that can be used to take custody of a suspect who refuses to be lawfully arrested or detained.  The Sixth Circuit has expressed doubt "that the use of non-lethal force against an armed and volatile suspect constitutes excessive force." *Ewolski v. City of Brunswick,* 287 F.3d 492, 508 (6th Cir.2002).[3] The Sixth Circuit has also held that "the use of a Taser in order to avoid a dangerous situation or the resort to even greater force [does] not violate clearly established law." *Caldwell v. Moore,* 968 F.2d 595, 600 (6th Cir.1992). Additionally, as Judge Carr recently observed, "[m]ultiple taser applications in drive stun format while multiple officers are attempting to subdue a still-resisting suspect **are objectively reasonable**." *Burdine,* at *7, citing *Sheffey v. City of Covington,* 2012 WL 28056, *12 (E.D.Ky.2012) (emphasis added).  Although Mr. Hammon was tased in both drive stun and

---

[3] *See also Russo v. City of Cincinnati,* 953 F.2d 1036, 1044–45 (6th Cir. 1992), holding officer entitled to qualified immunity despite his using Taser multiple times on knife-wielding suspect who was no longer an immediate threat; noting that officer's "actions were intended to avoid having to resort to lethal force."

7

probe modes, there is no reason why that proposition should not also apply to the Defendant Officers in this case.

In this case, the undisputed evidence shows that Mr. Hammon was violently resisting a lawful arrest by the Defendant Officers, and those officers believed their actions to be necessary to avoid a dangerous situation or having to resort to even greater force. (Burgett depo. at 12-13, 121, 160; Duff depo. at 63, 116). Although Mr. Hammon was perhaps not "armed" in the traditional understanding of the word, he was wielding a handcuff on one wrist, which can be used as a dangerous weapon if the person wearing it swings his arm. (Holderbaum depo. at 25; Burgett depo. at 192-193; Duff depo. at 62-64). Additionally, Sgt. Burgett testified that he did not know whether Mr. Hammon was armed, because he did not have an opportunity to search him before he started fighting with the officers. (Burgett depo. at 123). Further, the officers testified that they would not have been able to subdue Mr. Hammon without the Tasers. (Duff depo. at 63, 116). Sgt. Burgett testified that he considered Mr. Hammon a "serious threat" to himself and all of the other officers on the scene, because of his size, strength, and his "extremely violent" resistance to arrest (Burgett depo. at 12-13, 121, 160). For those reasons, the Defendant Officers are entitled to qualified immunity from Plaintiff's claims.

A recent case from the Northern District is instructive in this case. In *Turner v. City of Toledo*, 2012 WL 1669836 (N.D. Ohio May 14, 2012), the Court concluded that the defendant officers were entitled to qualified immunity after the death of an arrestee. In that case, the police were called to investigate a suspicious person standing in the street near a museum, and arrived to find Turner babbling incoherently about going to meet Jesus. The officers spoke with him for awhile, and then, suspecting that he was suffering from a mental illness, told him that they were

8

going to check him for weapons and then give him a ride home. During the pat-down, there was

a struggle, and Turner was tased three times. After he was handcuffed, he continued to roll and

attempt to stand up. The officers tried to tase him again, but did not make a successful

connection. They then tased him twice in drive-stun mode on the back of his neck, hog-tied him,

and placed him in the back of a police transport wagon to take him to jail. Two hours after he

was booked, after a disturbance in his cell, jail personnel deployed another Taser cycle in probe

mode, and one in drive-stun mode in the back of his leg. He died shortly thereafter.

The Coroner declared his death a "homicide" from sudden arrhythmia due to the physical

exertion from the altercations and the multiple (eight total) tasings. Nevertheless, the Court

concluded that the various defendants were each entitled to qualified immunity. In reaching that

conclusion, the Court explicitly rejected the plaintiff's claims that the minor nature of the initial

reason the police came into contact with Turner rendered the officers' actions unreasonable, due

to his subsequent resistance to the officers. *Turner*, at *8. In the present case, the nature of the

initial reason for Mr. Hammon's arrest (the officers' suspicion that he was operating a vehicle

under the influence of drugs or alcohol, and possession of drug paraphernalia) was not minor,

and certainly does not render the officers' use of force unreasonable, given his refusal to follow

their commands. (Burgett depo. at 145). The *Turner* Court also rejected the plaintiff's arguments

regarding the relative sizes of the parties involved, stating that there was no evidence that the

defendants could simply physically overpower Turner without the risk of injury. *Turner*, at *10.

Similarly, in this case, the officers have testified that they were unable to restrain him without the

use of the Tasers without increasing the risk of injury to themselves or Mr. Hammon. (Duff

depo. at 114, 116).

9

Additionally, with respect to Plaintiff's claims that placing Mr. Hammon in a prone position constitutes excessive force, the Sixth Circuit has never held that leaving a bound suspect on his stomach constitutes excessive force, and has in fact gone out of its way to avoid addressing the issue. *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 903 (6th Cir.2004). In that case, which involved *compressional*[4] asphyxia, the Court concluded that it had "no cause to consider whether leaving a bound suspect on his or her stomach without more constitutes excessive force that violates a suspect's clearly established Fourth Amendment rights." Id. Therefore, because such a right was not clearly established at the time of the incident involved in this case, the Defendant Officers are entitled to qualified immunity from Plaintiff's claims.

The Sixth Circuit applies the Fourth Amendment's "reasonableness" test to each factual segment of an excessive force claim. *Phelps v. Coy,* 286 F.3d 295, 301 (6th Cir.2002). Instead of lumping what might be multiple applications of allegedly excessive force into one sweeping Fourth Amendment analysis, the Sixth Circuit breaks the applications of force into segments and examines the reasonableness of each in turn.[5] Therefore, each officer's use of force will be analyzed in individual detail below.

> a    *Defendant Ptl. McCoy is entitled to qualified immunity from Plaintiff's excessive force claims.*

On the night of the incident, Ptl. McCoy was on his way home from working a shift with the Middleburg Heights Police Department when he saw Sgt. Burgett, Ptl. Holderbaum, and Ptl. Duff struggling with Mr. Hammon and stopped to render assistance. When he arrived, he

---

[4] It is undisputed that creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force in this Circuit.  See, e.g., *Champion*, at 903.  However, that is not the case in this matter, as there has been no evidence presented of any pressure applied to Mr. Hammon's back after he was successfully handcuffed.
[5] *See Russo,* 953 F.2d 1044–45; *Goebel v. Taser Int'l, Inc.,* 2007 WL 2713053, (N.D. Ohio Sept.14, 2007).

observed Mr. Hammon to be irate and out of control, swinging his arms wildly. (McCoy Depo. at

21). Ptl. McCoy tried to pull Mr. Hammon's arm out from underneath him, and knelt near Mr.

Hammon's head, placing his shin on his right shoulder and holding his head (which was facing

to the right) still with both hands. (Id. at 21). As soon as Mr. Hammon was safely handcuffed, he

and the other officers immediately stood up and stepped away. (Id. at 40). He observed that Mr.

Hammon immediately calmed down and was resting quietly. (Id. at 40).

There is no case law which would suggest that pulling on the arm, placing a shin on the

shoulder, or holding the head of an actively resisting subject could constitute excessive force.

During the struggle, Ptl. McCoy, of all of the officers, was the most vulnerable to injury from

Mr. Hammon, given that he was out of uniform, and had no protective armor or weapon. (Id. at

46). In fact, as discussed above, he was even tased in the process. He was entitled to use the

minimal force he used in order to assist in Mr. Hammon's arrest. There is no question that he is

entitled to qualified immunity from Plaintiff's excessive force claims.

> b    *Defendant Lt. Bulka is entitled to qualified immunity from Plaintiff's*
> *excessive force claims.*

Lt. Bulka also had very little participation in the arrest of Mr. Hammon. In fact, although

the other officers were still struggling with Mr. Hammon when he arrived on the scene, by the

time he exited his vehicle and stepped onto the grass, the other officers had gotten the second

cuff on him and all stood up. (Bulka depo. at 22-23). Lt. Bulka testified that Mr. Hammon was

conscious when he arrived, and was laying on his stomach, with his head turned to the right. (Id.

at 24-25).  Lt. Bulka remained at the scene until the paramedics arrived.  There is no evidence

that Lt. Bulka used *any* force on Mr. Hammon, let alone excessive force.  Therefore, Lt. Bulka is

entitled to qualified immunity from Plaintiff's claims.

11

> c   *Defendant Ptl. Duff is entitled to qualified immunity from Plaintiff's excessive force claims.*

Likewise, Ptl. Duff's involvement in the incident was quite limited. When he realized Ptl. Holderbaum and Sgt. Burgett needed assistance, he positioned himself at Mr. Hammon's legs and deployed his Taser unit one time, in drive stun mode, in the small of Mr. Hammon's back, in an attempt to help the other officers gain control of him. (Duff depo. at 79; 54). It appeared to have no effect upon Mr. Hammon whatsoever. (Id.). In fact, Ptl. Duff was so startled by the lack of effect upon Mr. Hammon that he pulled it away and looked at the device to make sure it was working. (Id.). Officer Duff used the Taser for only as long as it took to get control of Mr. Hammon's arm, and then put it away. (Id. at 77; 82). There is no case law which would suggest that Ptl. Duff's single Taser use, against a violently struggling subject, was "clearly established" such that Ptl. Duff would be deprived of qualified immunity from Plaintiff's excessive force claims. In fact, the opposite is true.[6] Therefore, Ptl. Duff is entitled to qualified immunity from Plaintiff's excessive force claims.

> d   *Defendant Ptl. Holderbaum is entitled to qualified immunity from Plaintiff's excessive force claims.*

Mr. Hammon violently resisted all of Ptl. Holderbaum's commands and attempts to handcuff him.  Ptl. Holderbaum used his Taser unit one time in drive stun mode, but it did not have the desired effect on Mr. Hammon, who continued to resist. He and Sgt. Burgett then tried to de-escalate the situation by backing away and using verbal commands again, without success. After Mr. Hammon started to get to his feet and move his arms in a manner that suggested that he intended to take a swing at the officers, Ptl. Holderbaum then deployed his Taser in probe

---

[6] *See, e.g., Edwards v. City of Martin's Ferry,* 554 F.Supp. 2d 797, 805–06 (S.D. Ohio 2008) (Taser use reasonable where 82-year-old suspect disregarded commands and tried to pull away from officer's grasp).

mode, but it seemed to have no effect whatsoever upon Mr. Hammon. After Mr. Hammon fell to the ground a second time and continued to refuse to produce his hand, Ptl. Holderbaum used fewer than five knee strikes to his rib cage and shoulder area to get Mr. Hammon to comply. (Id. at 133-134). As soon as they got cuffs onto both of Mr. Hammon's hands, he stopped resisting, and the officers immediately backed away. (Id. at 142). He explained to Lt. Bulka what had happened, checked on Mr. Hammon, and then left to go finish the accident report. (Id. at 146).

In summary, Ptl. Holderbaum used a take-down technique, two Taser cycles, and no more than five knee strikes to Hammon's rib cage. Ptl. Holderbaum's testimony is consistent with Ptl. Duff's testimony that the arresting officers could not have taken Mr. Hammon into custody without the use of their Tasers without risking serious bodily harm to Mr. Hammon or themselves. (Id. at 160-161). There is no evidence to support a conclusion that the use of those techniques on an actively resisting subject constitute excessive force.  At no time did Officer Holderbaum apply any pressure to Mr. Hammon's back, before or after he was in handcuffs. (Id. at 142). Therefore, Ptl. Holderbaum is entitled to qualified immunity from Plaintiff's claims.

> e  *Defendant Sgt. Eric Burgett is entitled to qualified immunity from Plaintiff's excessive force claims.*

Sgt. Burgett and Ptl. Holderbaum took Mr. Hammon to the ground after they were unable to handcuff him in a standing position. After unsuccessfully grappling with him on the ground, the officers tried to de-escalate the situation by retreating and using verbal commands.  After he saw that Ptl. Holderbaum's Taser had no effect upon Mr. Hammon, he deployed his own Taser in probe mode. (Burgett depo. at 176-177). However, Mr. Hammon continued to resist the officers' commands, and kept trying to roll over and get up. (Id.). Sgt. Burgett was positioned on Mr. Hammon's left side, and used his leg to try to keep Mr. Hammon's shoulder down. (Id. at

13

224). He then attempted to deliver a second cycle of current through the probe leads which had been deployed while Mr. Hammon was still standing, but stopped because it didn't seem to have any effect upon Mr. Hammon and two of the other officers were inadvertently shocked. (Id. at 179-180; 183; 191). He then administered a drive stun to Mr. Hammon in an attempt to assist the other officers in gaining compliance, because he felt that Mr. Hammon's violent actions were overpowering the four officers trying to restrain him. (Id. at 191-192; 225).

Sgt. Burgett was unsure whether he tased Mr. Hammon three or four times, and how many were successful. In *Burdine*, officers responding to a report of a fight pepper sprayed the suspect in order to place him in handcuffs.  After he arrived at the jail, he began to fight with the officers there, and was drivestunned three times in a short period of time.  *Id*.  The Court specifically concluded that the multiple Taser applications used to subdue a resisting subject were objectively reasonable.  *Burdine,* at *7. Even assuming, for purposes of this motion, that Sgt. Burgett tased Mr. Hammon four times, his conduct was objectively reasonable under the circumstances, given Mr. Hammon's extreme strength and violent resistance, and the officers' fear for their safety. He and the other officers tried verbal commands, hand-to-hand grappling, de-escalating the situation in an attempt to gain voluntary compliance from Mr. Hammon, ceased using their Taser units as soon as Mr. Hammon had been restrained, and used only the minimum amount of force necessary to accomplish their objectives. Therefore, Sgt. Burgett is entitled to qualified immunity from Plaintiff's excessive force claims.

> 2.    *The Defendant Officers are entitled to qualified immunity from Plaintiff's deliberate indifference claims.*

The Fourteenth Amendment guarantee of the right to due process requires the state "to provide medical care to persons who have been injured while being apprehended by the police."

14

*City of Revere v. Mass. Gen'l Hosp.,* 463 U.S. 239, 244 (1983). To "sustain a cause of action under § 1983 for failure to provide medical treatment, [a] plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.' " *Watkins v. City of Battle Creek,* 273 F.3d 682, 685 (6th Cir.2001). There is no evidence that any of the Defendant Officers were aware of any serious medical need of Mr. Hammon's until the moment he stopped breathing, let alone were deliberately indifferent to the same.  Deliberate indifference has been defined as a state of mind tantamount to an intent to punish. *Horn by Parks v. Madison Cnty. Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994). Establishing "deliberate indifference" requires proof of an objective component and a subjective component. *Comstock v. McCray,* 273 F.3d 693, 702 (6th Cir.2001). "The objective component requires the existence of a 'sufficiently serious' medical need," that was not addressed within a reasonable amount of time. *Blackmore v. Kalamazoo County,* 390 F.3d 890, 895 (6th Cir.2004). The subjective component requires a showing that officials were "aware of facts from which the inference could be drawn that a substantial risk of harm exists," *and* that they actually drew the inference. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

Plaintiff claims that the Defendant Officers knew or should have known that Mr. Hammon was in "significant physical distress" because he was handcuffed behind his back and "placed face down in the grass."  Plaintiff claims that the Defendant Officers' failure to re-position Mr. Hammon or provide him with medical attention constitutes deliberate indifference to a serious medical need.  (Amended Complaint, ¶¶ 38-43). However, the undisputed evidence shows that no such indifference, deliberate or otherwise, took place.

a    *Ptl. Duff, Ptl. Holderbaum, and Ptl. McCoy are entitled to qualified immunity from Plaintiff's deliberate indifference claims.*

First, there is no evidence that Officers Holderbaum, McCoy, or Duff had any objective or subjective knowledge that Mr. Hammon had a serious medical condition for which treatment was required.  Each of those three gentlemen immediately stepped back from Mr. Hammon as soon as he was handcuffed, and left him in the supervision of Sgt. Burgett and Lt. Bulka.  Before he left the scene, Ptl. McCoy saw and heard him breathing. (Id. at 42-44). Ptl. Duff went to finish the necessary incident reports from the traffic accident.  Ptl. Holderbaum left to complete the accident investigation, but not before he explained the series of events to Lt. Bulka and checked on Mr. Hammon, who was breathing at that time. Each was aware that Sgt. Burgett had called for medical attention for Mr. Hammon. There is simply no evidence that they were a) aware of a serious medical need of Mr. Hammon's or b) deliberately indifferent to such a need. There is certainly no evidence that any of them had a state of mind tantamount to an intent to punish. Indeed, Ptl. Holderbaum testified that if he were aware that a member of the community in his custody needed medical attention, he would have done "whatever it takes" to render assistance to that person. (Holderbaum depo. at 164).

b    *Lt. Bulka and Sgt. Burgett are entitled to qualified immunity from Plaintiff's claims of deliberate indifference to a serious medical need.*

Sgt. Burgett immediately called for an ambulance as soon as Mr. Hammon was handcuffed, before he was even aware that Mr. Hammon stopped breathing. Either he or Lt. Bulka remained with Mr. Hammon the entire time until the paramedics arrived, and both of them observed him to be breathing after he had been placed in handcuffs. As soon as Sgt. Burgett noticed that Mr. Hammon had stopped breathing (contemporaneously with the arrival of the

16

paramedics), he notified them of the same. Neither of those gentlemen was aware of any serious medical need of Mr. Hammon's until that moment, nor did they refuse to provide medical treatment to him in a timely manner. Finally, as with the other officers, there is certainly no evidence that either of them had a state of mind tantamount to an intent to punish Mr. Hammon by denying him the benefit of medical attention. Therefore, both Lt. Bulka and Sgt. Burgett are entitled to qualified immunity from Plaintiff's claims for deliberate indifference to a serious medical need.

      **B.**      **THE CITY OF MIDDLEBURG HEIGHTS IS ENTITLED TO JUDGMENT IN ITS FAVOR AS A MATTER OF LAW ON PLAINTIFF'S CLAIMS FOR THE ADOPTION OF UNCONSTITUTIONAL CUSTOMS AND POLICIES, FAILURE TO TRAIN, AND RATIFICATION.**

A municipality is liable for a constitutional violation *only* when it is the execution of the municipality's policy or custom that inflicts the alleged injury. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). The official policy or custom "must be the moving force of the constitutional violation" to establish the liability. *Polk County v. Dodson,* 454 U.S. 312, 326 (1981). A municipality cannot be held liable under § 1983 absent an underlying constitutional violation by its officers. *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point."); see also *Austin v. Redford Twp. Police Dep't,* 2011 WL 4596006 (E.D.Mich. July 18, 2011) ("[P]laintiff's municipal liability claim is derivative of his claim against the individual officers, and success on the municipal liability claim requires plaintiff to first establish that the individual defendants violated his constitutional rights.") (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 120, (1992)). Because none of the Defendant Officers

17

engaged in any constitutional violations, there can be no derivative liability for the City. Put simply, if there was no constitutional violation, then as a matter of law, the City's training, and policies caused no harm.  Likewise, Plaintiff's claims for ratification must fail in the absence of any underlying violation to ratify. Therefore, the City and all of the other Defendants in their official capacities are entitled to judgment in their favor as a matter of law on Plaintiff's claims.

**C.    DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR AS A MATTER OF LAW ON PLAINTIFF'S STATE-LAW CLAIMS FOR ASSAULT, BATTERY, AND WRONGFUL DEATH.**

As with supervisory and municipal liability under Section 1983, the resolution of Plaintiff's state-law claims is dependent in part upon whether qualified immunity applies to the federal claims in this case. Indeed, the Sixth Circuit has observed that a showing of objective reasonableness under federal law would entitle Defendants to immunity from state-law claims under Ohio law. *See Chappell v. City of Cleveland,* 585 F.3d 901, 916 n. 3 (2009).

The City and the Defendant Officers are entitled to statutory immunity from Plaintiff's state law claims pursuant to R.C. § 2744.01, *et seq*. Chapter 2744 of the Ohio Revised Code grants immunity to political subdivisions for injuries caused by any act or omission unless one of five narrow exceptions applies. R.C. 2744.02(A)(1). None of those exceptions are applicable in this case. "The provision or nonprovision of police [ . . . ] services or protection" is a governmental function, for which the City is entitled to immunity. See *Weibel v. Akron*, 9th Dist. No. 14878, at *1 (May 8, 1991). Additionally, in Ohio, a political subdivision may not be held liable for intentional torts unless liability is expressly imposed upon the political subdivision by a section of the Revised Code. R.C. 2774.02(B)(5).

18

Pursuant to R.C. 2744.03(A)(6)(a)-(c), an employee of a political subdivision is immune from liability unless the employee's actions were manifestly outside the scope of his employment, were done with malicious purpose, in bad faith, or in a wanton or reckless manner, or where civil liability is expressly imposed upon the employee by statute. There is no genuine dispute of material fact concerning Defendants Holderbaum, Burgett, Duff, and Bulka's[7] actions toward Mr. Hammon. There is no evidence that those gentlemen acted with a malicious purpose, in bad faith, or in a wanton or reckless manner. One acts with a malicious purpose if one willfully and intentionally acts with a purpose to cause harm. *Piro v. Franklin Twp.*, 102 Ohio App.3d 130, 139, 656 N.E.2d 1035 (1995). Malice includes "the willful and intentional design to do injury, or the intention or desire to harm another through conduct which is unlawful or unjustified." *Shadoan v. Summit Co.,*2003-Ohio-5775, ¶ 12. Bad faith is defined as a "dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive or ill will." *Lindsey v. Summit Cty. Children Services Bd.,* 2009-Ohio-2457, at ¶ 16. A person acts wantonly if that person acts with a complete "failure to exercise any care whatsoever." *Fabrey v. McDonald Police Dept.*, 70 Ohio St.3d 351, 356 (1994). One acts recklessly if one is aware that one's conduct "creates an unreasonable risk of physical harm to another." *Thompson v. McNeill*, 53 Ohio St.3d 102, 104 (1990). Recklessness is more than mere negligence in that the person "must be conscious that his [or her] conduct will in all probability result in injury." *Fabrey,* at 356.

As the facts discussed at length above show, there is no evidence which would support an inference that the Defendant Officers acted in any way that could be described as with malicious purpose, in bad faith, or in a wanton or reckless manner, as those terms have been defined by

---

[7] Plaintiff's First Amended Complaint alleges no state-law claims explicitly against Ptl. McCoy.

Ohio law. Fearing for the safety of themselves and the surrounding public due to Mr. Hammon's size, strength, and violent struggles with them, they used only the amount of force necessary to take him into custody. There is certainly no evidence which would support a conclusion that they failed to exercise any care whatsoever.  For those reasons, Defendants are entitled to judgment in their favor as a matter of law on Plaintiff's state-law claims.

## III.  <u>CONCLUSION</u>

It has long been recognized that officials cannot perform their jobs safely or effectively if their every split-second decision is analyzed with knowledge gained only through hindsight. *Kostrzewa v. City of Troy,* 247 F.3d 633, 639 (6th Cir. 2001). In this case, the undisputed evidence shows that, as unfortunate as Mr. Hammon's death was, it was not the result of any wrongdoing by the Defendant Officers, or as a result of any deficiency in the City's policies, procedures, training, hiring, or supervision. For those reasons, the Defendant Officers, Chief Maddox, and the City are entitled to summary judgment in their favor as a matter of law.

Respectfully submitted,

MAZANEC, RASKIN & RYDER CO., L.P.A.

*s/Julie A. Bickis*
TODD M. RASKIN (0003625)
CARL E. CORMANY (0019004)
JULIE A. BICKIS  (0079277)
100 Franklin's Row
34305 Solon Road
Cleveland, OH 44139
(440) 248-7906
(440) 248-8861 – Fax
Email:  traskin@mrrlaw.com
        ccormany@mrrlaw.com
        jbickis@mrrlaw.com

Counsel for Defendants City of Middleburg Heights, Officer David L. Holderbaum, Officer Eric J. Burgett, Officer Joseph Duff, Chief John W. Maddox, Jr., Officer Raymond Bulka and Officer Nick J. McCoy

TRAVR-110245/Brief in Support of D's MSJ